J-S08006-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| STEVEN BOUTTE | : | |
| | : | |
| Appellant | : | No. 1199 EDA 2024 |

Appeal from the Judgment of Sentence Entered January 24, 2024
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0000877-2023

BEFORE: DUBOW, J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY DUBOW, J.: **FILED APRIL 3, 2025**

Appellant Steven Boutte appeals from the Judgment of Sentence entered in the Bucks County Court of County Pleas after a jury found him guilty of Attempted Involuntary Deviate Sexual Intercourse ("IDSI"), Attempted Statutory Sexual Assault, Unlawful Contact with a Minor, and Attempted Sexual Abuse of a Child-Photographing,[1] in connection with his sexually explicit communications with a thirteen-year-old girl. Appellant's counsel filed a Petition to Withdraw as Counsel and an **Anders** Brief.[2] Following our review, we adopt the trial court's July 10, 2024 opinion as our

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 901, 3123(a)(7), 3122.1(b), 6318(a)(1), 6312(b)(1).

[2] **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).

own, discern no issues of arguable merit, affirm the judgment of sentence, and grant counsel's petition to withdraw.

The trial court provided a detailed review of the factual and procedural history, which we adopt as our own. *See* Tr. Ct. Op., dated 7/10/24, at 1-15. In sum,

> This case arises from Appellant Steven Boutte's unsettling two-week long campaign to meet up with a middle-school-aged girl for sex. Specifically, between December 1 and 19, 2022, Appellant Boutte[, then-52-years-old,] exchanged hundreds of text and social media messages with who he thought to be a thirteen-year-old girl named Isabella, who was looking to meet up near her home in Bensalem for sexual activity. As Appellant ultimately discovered, however, Isabella never exists. Rather, throughout the term of Appellant's clandestine affair, he was actually communicating with a police officer – Detective Ryan Kolb of the Bensalem Township Police Department . . . , an officer with the Pennsylvania Internet Crimes Against Children Task Force, [who] was operating undercover on a social media app called MocoSpace.

*Id*. at 1. *See also id*. at 2-14 (reviewing testimony and quoting the explicit text message exchanges between Detective Kolb as "Izzy" and Appellant that occurred between December 2, 2022, and December 19, 2022, and the intentional actions taken by Appellant in furtherance of his crimes). The Commonwealth arrested Appellant on January 11, 2023, and charged him with, *inter alia*, the above charges. Appellant did not dispute that the communications occurred.

Appellant proceeded to trial on December 4 and 5, 2023. The Commonwealth presented to the jury the text messages and testimony from

Detective Kolb and other police officers regarding their investigation. Appellant testified on his own behalf. He conceded that the communications regarding oral sex and his requests for sexually explicit photos occurred and acknowledged that he could have been texting with a 13-year-old girl, but averred that he was acting in the role of a fake pedophile to investigate and trap perpetrators of on-line cyber harassment of children.

On December 6, 2023, the jury convicted him of the above offenses. On January 24, 2024, the court sentenced him on one count of Unlawful Contact with a Minor to a term of six to twelve years' incarceration. The court imposed no further penalty on the other convictions noted above. Appellant filed post-sentence motions, which the court denied.

Appellant appealed, and both he and the trial court complied with Pa.R.A.P. 1925. Appellant's counsel filed an **Anders** Brief raising the following issues:

1. Were the verdicts of guilty supported by sufficient evidence?

2. Were the verdicts of guilty against the weight of the evidence?

**Anders** Br. at 15.

* * *

As a preliminary matter, we address counsel's request to withdraw as counsel. "When presented with an **Anders** Brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." **Commonwealth v. Daniels**, 999 A.2d 590, 593 (Pa. Super.

2010) (citation omitted). For counsel to withdraw from an appeal pursuant to *Anders*, our Supreme Court has determined that counsel must meet the following requirements:

(1)    provide a summary of the procedural history and facts, with citations to the record;

(2)    refer to anything in the record that counsel believes arguably supports the appeal;

(3)    set forth counsel's conclusion that the appeal is frivolous; and

(4)    state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009).

Counsel in the instant case has complied with the mandated procedure for withdrawing as counsel. Additionally, counsel confirms that she sent Appellant a copy of the *Anders* Brief and Petition to Withdraw, as well as a letter explaining to Appellant that he has the right to retain new counsel, proceed *pro se*, or to raise any additional points. *See Commonwealth v. Millisock*, 873 A.2d 748, 751 (Pa. Super. 2005) (describing notice requirements).

Because counsel has satisfied the above requirements, we will first address the substantive issues raised in the *Anders* Brief. Subsequently, we must "make a full examination of the proceedings and make an independent judgment as to whether the appeal is in fact wholly frivolous." *Santiago*, 978

- 4 -

A.2d at 355 n.5 (citation omitted). ***See also Commonwealth v. Yorgey***, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*) (noting ***Anders*** requires the reviewing court to "review 'the case' as presented in the entire record with consideration first of issues raised by counsel.").

\* \* \*

Appellant challenges the sufficiency and weight of the evidence underlying each of his four convictions. ***See Anders*** Br. at 19-27. "When considering a challenge to the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish every element of the offense beyond a reasonable doubt." ***Commonwealth v. Reaser***, 851 A.2d 144, 147 (Pa. Super. 2004) (citation omitted). "In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder." ***Commonwealth v. Melvin***, 103 A.3d 1, 39–40 (Pa. Super. 2014) (citation omitted). "[T]he finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence." ***Id.*** (citation omitted). Additionally, the Commonwealth need not establish facts and circumstances that preclude every possibility of innocence. ***Commonwealth v. Estepp***, 17 A.3d 939, 943 (Pa. Super. 2011). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no

probability of fact may be drawn from the combined circumstances." ***Id.*** (citation omitted). Notably, the Commonwealth may sustain its burden by presenting wholly circumstantial evidence. ***Melvin***, 103 A.3d at 40.

We apply the following well-settled standard of review to a challenge to the weight of the evidence: "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." ***Commonwealth v. Talbert***, 129 A.3d 536, 545 (Pa. Super. 2015) (citation omitted). "Resolving contradictory testimony and questions of credibility are matters for" the finder of fact. ***Commonwealth v. Hopkins***, 747 A.2d 910, 917 (Pa. Super. 2000). We cannot substitute our judgment for that of the fact[-]finder. ***Talbert***, 129 A.3d at 546. "A decision regarding the weight of the evidence is within the sound discretion of the trial judge whose decision will not be reversed on appeal absent an abuse of that discretion." ***Commonwealth v. Dougherty***, 679 A.2d 779, 785 (Pa. Super. 1996) (citation omitted).

\* \* \*

Pursuant to our Crimes Code, a person commits IDSI when he commits deviate sexual intercourse with a complainant "who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other." 18 Pa.C.S. § 3123(a)(7). "Deviate sexual intercourse" includes "sexual intercourse per os or per anus[.]" ***Id.*** at § 3101.

Further, a person will be found guilty of Statutory Sexual Assault if he "engages in sexual intercourse with a complainant under the age of 16 years, and that person is 11 or more years older than the complainant, and the complainant and the person are not married to each other." *Id.* at § 3122.1.

With respect to the crime of Sexual Abuse of Children-Photography, "[a]ny person who causes or knowingly permits a child under the age of 18 years to engage in a prohibited sexual act or in the simulation of such act commits an offense if such person knows, has reason to know or intends that such act may be photographed, videotaped, depicted on computer or filmed" is guilty of sexual abuse of children. *Id.* at § 6312(b)(1).

A person commits the offense of Unlawful Contact with A Minor if he "is intentionally in contact with a minor, or a law enforcement officer acting in the performance of duties who has assumed the identity of a minor or of another individual having direct contact with children . . . for the purpose of engaging in an activity prohibited under [Chapter 31-sexual offenses] and either the person initiating the contact or the person being contacted is within this Commonwealth[.]"*Id.* at § 6318(a)(1).

Finally, the Commonwealth charged each of Appellant's offenses as criminal attempts. "A person commits attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." *Id.* at § 901.

* * *

Here, the court thoroughly addressed the sufficiency and weight of the evidence supporting each offense with reference to legal authority; it discussed in detail the evidence presented at trial, and analyzed each element of each offense before concluding that sufficient evidence supported each conviction and the jury's verdict was not against the weight of the evidence so as to shock the court's conscience. Following our review, we adopt the trial court's opinion as our own. *See* Tr. Ct. Op. at 19-26 (addressing the convictions of Attempted IDSI and Attempted Statutory Sexual Abuse and concluding that the evidence—"the vast bulk of which being Appellant's own words"— proved that Appellant "had every intention of meeting with 'Izzy' near the Scottish Inn" or in his car to engage in the explicit sexual activity about which he and "Izzy" had been communicating for over two weeks); 26-27 (reviewing the evidence relevant to the sexual abuse charge that showed that Appellant requested "Izzy" to send him a photograph of her vagina— corroborated by Appellant's own testimony—and concluding that the text "messages' plain meaning[] amply support[ed the] jury's finding that Appellant intended to obtain child pornography and sent this message as a substantial step in furtherance of that intent"); 27-29 (concluding the Commonwealth "carried its burden in spades" where "there was no dispute that Appellant was in direct contact with Detective Kolb—a police officer portraying a minor online[;]" Appellant contacted "Izzy's" profile with a user name "OnThaHunt" connected with a profile picture of Appellant; the phone

that initiated contact with "Izzy" was registered to Appellant; and "the messages and testimony presented by the Commonwealth proved beyond a reasonable doubt that Appellant intended to meet up with [`]Izzy['] and engage in both deviate and ordinary sexual activity with her[,] … acts prohibited by Chapter 31 of the Crimes Code as IDSI and Statutory Sexual Assault"); 29-35 (addressing Appellant's theory as presented during his testimony and concluding that the jury's verdict was not against the weight of the evidence: the jury reasonably weighed his testimony against the contradicting evidence to discredit Appellant's claims that he was conducting his own investigation to "scam[] the scammers.")

Following our review, we conclude the record, viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to establish every element of the offenses beyond a reasonable doubt and the court properly exercised its discretion in denying Appellant's weight claim. In addition, following our independent review, we discern no meritorious issues to be raised on appeal. We, thus, affirm the judgment of sentence.

We direct the parties to annex the Opinion of the Honorable Jeffrey L. Finley, dated July 10, 2024, to any future court filings.

Judgment of Sentence affirmed. Counsel's petition to withdraw granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>4/3/2025</u>

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, Appellee | : : : | CP-09-CR-0000877-2023 |
| v. | : : | |
| STEVEN BOUTTE, Appellant. | : : : : | OPTIONAL |

FILED IN
SUPERIOR COURT
JUL 1 8 2024
EASTERN DISTRICT

**OPINION**

Steven Boutte ("Appellant") appeals to the Superior Court of Pennsylvania from his convictions before this Court on December 6, 2023. Pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), this Court files this Opinion in support thereof.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case arises from Appellant Steven Boutte's unsettling two-week long campaign to meet up with a middle-school-aged girl for sex. Specifically, between December 1 and December 19, 2022, Appellant Boutte exchanged hundreds of text and social media messages with who he thought to be a thirteen-year-old girl named Isabella, who was looking to meet up near her home in Bensalem for sexual activity. As Appellant ultimately discovered, however, Isabella never existed. Rather, throughout the term of Appellant's clandestine affair, he was actually communicating with a police officer – Detective Ryan Kolb of the Bensalem Township Police Department.

On December 1, 2022, Detective Kolb, an officer with the Pennsylvania Internet Crimes Against Children Task Force, was operating undercover on a social media app called MocoSpace. N.T. 12/4/2023, pp. 24-25, 32. According to the Detective, Moco is a social media site used

1

information, such as their photograph, age, and dating preferences. *Id.* Moco will then connect users based on the age, sex, and geographic criteria programmed by the account owners. *Id.* at pp. 28-29.

As part of his investigation, Detective Kolb was operating a Moco account under the guise of Isabella, a thirteen-year-old Middle Eastern female who lived alone with her mother in Bensalem Township. *Id.* at pp. 29-30. The account's profile picture seemingly depicted a young girl in a Bensalem High School Volleyball shirt at a middle school football game. *Id.* at p. 27. That image, however, was in reality a photo of Detective Kolb's partner, Detective Amal Yasin, who had been de-aged using the photo-editing software FaceApp. *Id.* at pp. 27-28. Using this procedure, Detectives Kolb and Yasin produced a catalogue of photos depicting "Izzy" in numerous scenarios and poses, like touching her nose or ear. *Id.* at p. 27. Detective Kolb testified that these were created in case a suspect requested additional photographic verification of the account's authenticity. *Id.*

### A. December 1-2, 2022 – First Contact with Appellant.

Shortly after the Izzy account went live, another Moco user with the screen name "OnThaHunt" contacted Izzy asking to be her "sugar poppy." *Id.* at pp. 32-33; Commonwealth's Exhibit C-1 ("C-1"). The account's profile picture depicted Appellant standing in front of a horse. *See,* C-1. Izzy[1] indicated that she was interested in Appellant's proposal and supplied Appellant with a phone number to continue their communication via text message. *Id.*

In the morning hours of December 2, 2022, Izzy received a text message from "OnThaHunt" introducing himself as "Eric." N.T. 12/4/2023, p. 38. A search of this number through law enforcement databases reported the number as registered to Appellant Steven Boutte.

---

[1] Detective Kolb was the only officer in control of Izzy's account throughout the term of his investigation. Accordingly, this Court will refer to any action taken by the Detective through the Izzy account as being taken by Izzy.

*Id.* at p. 48. Once introductions were made, Izzy sent the following text message to Appellant at 12:47pm: "Uh idk if ur ok w it but I'm only 13. If not it's no biggie I understand. [*sic*]" *Id.* at p. 39; Commonwealth's Exhibit C-2 ("C-2"), 12/2/2022, 12:42:09pm-12:42:19pm. According to Detective Kolb, his practice is to make his persona's age clear to a suspect as early as possible to ensure he is talking only with persons seeking sexual encounters with children. N.T. 12/4/2023, p. 31.

After requesting and receiving an initial verification photo of Izzy touching her nose, Appellant responded at 1:50pm with a nervous-face emoji, followed by "I just read what you sent earlier about your age, I missed that in the mix of doing stuff .. very sorry can't do." N.T. 12/4/2023, p. 40; C-2 at 12/2/2022, 1:50:46pm. Five minutes later, at 1:55pm, Izzy responded "Ok understand." N.T. 12/4/2023, p. 40; C-2 at 12/2/2022, 1:55:06pm.

Two hours later, however, at 3:41pm, Appellant abruptly resumed contact with the Izzy account, directing her to check her Moco messages. N.T. 12/4/2023, pp. 40-41; C-2 at 12/2/2022, 3:41:56pm. In those messages, Appellant and Izzy have the following exchange:

> APPELLANT: So if I say yes, what can we do
> IZZY: I mean in down for whatever tbh
> APPELLANT: You got me like on a do, don't i
> APPELLANT: Your people don't have you on lock like that? You can get out?
> APPELLANT: Like if I met up with you, we chill a bit, I give you head[2] only for start in the car, what would you need from me to do this
> [*sic*]

C-1. Appellant further messaged Izzy that he "came back on [Moco] because [he] didn't want to get in any trouble," and then asked Izzy where in Bensalem she lived. N.T. 12/4/2023, pp. 42-43; C-1. Izzy responded that she lived next door to the Scottish Inn on Bristol Pike. N.T. 12/4/2023,

---

[2] Detective Kolb understood this to be a euphemism for oral sex. N.T. 12/4/2022, p. 41.

p. 43; C-1. Izzy then asked "[y]ou gonna pick me up? Obvi [*sic*] I can't drive for three years lol." *Id*. Appellant responded "[y]es, a pickup. Can't wait until you drive." *Id*. Appellant then asked Izzy for another photograph. *Id*. Just before 7:00pm, Appellant and Izzy had planned by text message to meet the next day, December 3, while Izzy's mother was at work. *See*, C-2 at 12/2/2022, 6:50:11pm-6:55:55pm.

At 8:11pm, Izzy texted Appellant asking "[s]o lik wat u lookin to do tomorrow I'm down prob but lik I jus would feel less nervous if I knew b4. [*sic*]" C-2 at 12/2/2022, 8:11:37pm. After some discussion on the subject, Appellant responded at 8:20pm that "I love to please a woman. it [*sic*] may sound strange to you but you have power to do what you want with me." C-2 at 12/2/2022, 8:20:07pm. Izzy responded that she was excited. *Id*. Finally, at 8:24pm, Appellant followed up with a message asking "[c]an I get a peek at what I'll be eating," which Detective Kolb understood to seek a photo of Izzy's vagina. C-2 at 12/2/2022, 8:24:26pm; N.T. 12/4/2023, p. 47. Izzy, of course, rebuffed Appellant's request, appealing to a supposed parental control app that allowed her mother to monitor Izzy's photos. C-2 at 12/2/2022, 8:25:20pm.

### B. December 3, 2022 – The First Planned Meeting.

On the day of their first scheduled meet-up, however, Appellant seemingly got cold feet. Specifically, at 3:40pm, he told Izzy that he was no longer going to pick her up, and that he had to stop messaging her. N.T. 12/4/2023, p. 49. When Izzy asked why, Appellant directed her to "[g]o to Moco." C-2 at 12/3/2022, 3:43:12pm. Once there, Izzy observed the following messages, presumably sent by Appellant earlier that day:

> APPELLANT: Hey... I have to stop texting with you, its [*sic*] what I been thinking over and over[.]
>
> APPELLANT: I apologize, please take care of yourself, and say no to the weirdos[.]

4

C-1. Back on text, Izzy responded "I jus read it's ok I get it I gess. Lemme kno if u change ur mind [*sic*]." C-2 at 12/3/2022, 3:43:14pm. After this, contact with Appellant ceased and Detective Kolb prepared to close his investigation. N.T. 12/4/2023, p. 50.

Later that day, however, Appellant reopened communication on Moco by sending Izzy a photo of a young Middle Eastern girl holding an art project. *Id.* at pp. 50-51. Detective Kolb suspected that this photo was taken from Snyder Middle School's webpage, which Appellant later confirmed during his testimony. *Id.* at pp. 51; N.T. 12/5/2023, p. 149-50 From there, Izzy and Appellant had the following exchange:

IZZY: Hi

APPELLANT: Hey,that was your artwork?

IZZY: Huh

APPELLANT: The picture I sent here

IZZY: Creepy lol

APPELLANT: Sorry let me explain, you're just too young and I was researching to find you and see what was real, your real name is [REDACTED][3]??

IZZY: Huh

IZZY: No my name is Isabella lol

APPELLANT: Hold on

APPELLANT: Not u?

IZZY: I'd hav sent u my [Instagram] but seems pointless now

IZZY: Thts not me ew shes ugly

APPELLANT: Ooo wow I thought this was you and she's like younger

APPELLANT: Same school, Snyder, lives same area by Scottish suite, crazy

IZZY: Ya I go to Snyder how u know tht

APPELLANT: The pic you sent before has the logo on your hoodie

IZZY: O I didnt even realize

APPELLANT: Ima be honest, age difference has me terrified so I just can't

IZZY: It's ok I gess. Jus bummed

---

[3] The student's name has been redacted herein in the interest of privacy.

[*sic*]

C-1. *See, also*, 12/4/2023, pp. 51-54.

### C. *December 4, 5, and 6 – Appellant and Izzy Plan a Second Meeting.*

Like before, however, Appellant could not stay away for long. The very next day – December 4, 2022 – Appellant travelled to the Bristol Pike Scottish Inn and sent Izzy a photo of its sign on Moco. *See*, N.T. 12/4/2023, p. 54. Attached was a message saying, "I get you out of my head" – presumably a typo for "I *cannot* get you out of my head." *Id.* During the ensuing conversation, Appellant disclosed that he lived only ten minutes from the Inn. *Id.* at p. 55. He then made further attempts to get Izzy to disclose her specific address but relented when she expressed discomfort. *Id.* at pp. 55-56. The two spent the rest of the day rescheduling their meet-up, working around Izzy's mother's work schedule. *Id.* at pp. 57-58. Appellant also sought to confirm whether Izzy could guarantee "the situation will never be found out." *Id.* at p. 56.

On December 5, 2022, Appellant and Izzy exchanged flirtatious banter over Moco throughout the day, including a message from Appellant that he had been thinking of her "every moment" since he found her. *Id.* at p. 59. Appellant also drew Izzy's attention to his profile picture, which he had changed to a soft drink called "Izze." *Id.* at p. 59. He indicated that this was to signify that he was only on Moco for her. *Id.*

These communications continued in the morning hours of December 6, 2022, where Appellant sought to confirm via Moco whether Izzy was comfortable with "not being able to be together but just getting together to have fun." *Id.* at p. 61. Izzy indicated that she was, and the two spent the rest of the day exchanging suggestive messages and planning their meeting. *See, id.* at pp. 65-67. Ultimately, they decided to meet at some point the following week while Izzy's mother was at work. *See*, C-2 at 12/6/2022, 4:25:23pm-4:34:49pm. Appellant stated that he could not believe they were actually going to meet, and that although he had originally tried to convince

6

himself to stay away, that he just could not say no to Izzy. N.T. 12/4/2023, pp. 66-67. The evening concluded with another volley of sexually-charged messages wherein Appellant, *inter alia*, fantasized about rubbing Izzy's feet and described his lips as "[f]ull, soft, and always needing a bedtime snack." *Id.* at pp. 70-71. *See, also*, C-2 at 12/6/2022, 9:36:12pm-9:46:49pm

### D. December 8-12, 2022 – Appellant and Izzy Confirm Their Second Meeting.

On December 8, 2022, conversation between Appellant and Izzy very deliberately turned to discussing what the nature of their meet-up would look like. *Id.* at p. 71. In particular, Appellant indicated that "[n]ext week is all I think about," and inquired what Izzy found out about her mother's work schedule. *Id.* at p. 72. Ultimately, it was decided that the two would meet up at the Scottish Inn in the evening of Tuesday, December 13, 2022, while Izzy's mother was at work. *Id.* at pp. 72-73. Appellant would rent a room at the Inn, and Izzy would meet him there when her mother left. *Id.*

From December 9-10, 2022, Appellant and Izzy exchanged idle conversation and traded selfies. *See*, C-2 at 12/9/2022, 8:39:57am-12/10/2022, 12:40:30pm. Then, on December 11, 2022, at almost 2:00am, Appellant texted Izzy "I'm in bed and so like thinking I wish you were here pushing your body up against mine." C-2 at 12/11/2022, 1:50:03am. *See, also*, N.T. 12/4/2023, p. 74. Izzy did not read this message until later that morning, after which the following ensued:

> IZZY: Omg I want tht. Sounds so hot
>
> IZZY: Wat else u wana do w me [4]
>
> APPELLANT: Caress you, nibble on your ear, suck your neck and bite your lips
>
> APPELLANT: As you get moist you put your hand down inside your panties and then bring your hand up for us to lick your fingers
>
> IZZY: omg this is makin me crazy readin it

---

[4] Detective Kolb testified that as part of his training, he never initiates the escalation of sexual topics with suspects. *See*, N.T. 12/4/2023, pp. 46-47. In these cases, he keeps his responses open-ended and only escalates when the suspect does. *Id.*

> APPELLANT: and what are you going to do
>
> IZZY: I cant do anything in w my mom!
>
> IZZY: Tell me wat else u gona do w me
>
> APPELLANT: I flip you up to sit on my chest as lim laying on my back, our fingers are interlock and you push my arms back pinning me down, and you push yourself into my face and grind as you yell at me to eat it
>
> [*sic*]

C-2 at 12/11/2022, 9:24:36am-11:06:56am (emojis omitted). *See, also*, N.T. 12/4/2023, pp. 74-76.

On December 12, 2022, Appellant and Izzy discussed a slight change in their meet-up plan. N.T. 12/4/2023, p. 77. Following Appellant's research of the Scottish Inn, he determined it was an unsuitable location. *Id.* at pp. 77-78. Accordingly, he and Izzy agreed instead to use Appellant's car, the back seats of which he would convert into a make-shift bed. *Id.* at pp. 78-79.

Appellant then noted that this would limit them to "two things," and sent Izzy an image of several Kama Sutra-styled sexual positions. *Id.* at p. 80. *See, also*, Court's Exhibit CRT-6 ("CRT-6"), Slide 10. Two of these positions – an oral sex position and a vaginal sex position – were checked off in red to indicate the ones Appellant was referring to. CRT-6 at Slide 10.

### E. December 13, 2022 – The Second Planned Meeting.

On December 13, 2022, Appellant confirmed he would pick Izzy up at 11:00pm that evening. N.T. 12/4/2023, p. 82. From there, he proposed to stay close to Izzy's home and park in the lot across the street. *Id.* at 83. According to Appellant, this arrangement would allow Izzy to get home quickly in case her mother came home early. *See*, C-2 at 12/13/2022, 2:45:36pm-2:57:15pm. Izzy agreed with the proposal, and the plan was set. *Id.* At 7:03pm, Appellant initiated the following exchange:

> APPELLANT: I want to fulfill all your needs tonight
>
> IZZY: I am lik so ready for tht fr
>
> IZZY: Wat about ur needs
>
> APPELLANT: Are you into licking and sucking like me?

8

IZZY: Ya I want u to b lik happy too

APPELLANT: To be with you at all for me is like [fire emoji]

IZZY: I want ur needs to b fulfilled too

APPELLANT: You know what happens to me if we are ever found out?

IZZY: I gess we would both get in trouble but I'm so careful

APPELLANT: Very true, it's the only part of this that got me like [nervous emoji], but my want for you, got me like [heart-eyes emoji]

APPELLANT: I'm going to be totally honest with you, I've never struggled so much with a decision in my life

APPELLANT: My satisfaction will be to see you get off and make swallow every drop

[*sic*]

C-2 at 12/13/2022, 7:03:49pm-7:19:28pm (emojis omitted). *See, also*, N.T. 12/4/2023, pp. 83-84. At 7:29pm, Izzy noted that she wished the two had a bed, to which Appellant replied "[y]o.... exactly my feeling, I didn't like that we don't, but I made our situation comfortable as possible, you'll see." C-2 at 12/13/2022, 7:29:04pm-7:30:36pm.

In the meantime, Detective Kolb enlisted the assistance of Detectives Brian Oliverio and Greg Smith to establish surveillance over the meeting location. N.T. 12/4/2023, p. 86. Because there was no supervisor on duty that night, the Detectives planned to take photos and videos of Appellant at the scene to support a later arrest. *Id.* at pp. 86-87. To accomplish this, each Detective was in an unmarked police vehicle, which they positioned at various points around the Scottish Inn. *See, id.*at pp. 86-87. Detective Kolb positioned himself in the Scottish Inn's rear parking lot while Detective Oliverio took position on Gray Avenue and Detective Smith parked across the street. *Id.* at pp. 87-88. Detective Kolb remained in constant contact with the other Detectives while messaging Appellant. *Id.* at p. 89.

At 10:42pm, Appellant texted Izzy confirming that he was five to ten minutes away, and asking if she had her coat on. N.T. 12/5/2023, p. 24. Izzy responded that she had butterflies to see

9

him, to which Appellant replied "[l]ol.. more like scared ASF for me." C-2 at 12/13/2022, 10:43:27. *See, also,* N.T. 12/5/2023, p. 25. Izzy pointed out that they did not have to meet if Appellant did not want to, but Appellant affirmed that he had every intention of meeting. N.T. 12/5/2023, p. 25.

At or around 10:45pm, Detective Oliverio observed a dark station wagon with New Jersey plates pull into the Scottish Inn. *Id.* at pp. 12-13. The vehicle drove passed Detective Oliverio's position on Gray Avenue, turned around in the Scottish Inn parking lot, and sped out of the area onto Bristol Pike. *Id.* at pp. 12-14. Later investigation revealed that Appellant owned a black Mercedez-Benz station wagon, which Detective Oliverio identified as the vehicle he observed that night. *Id.* at pp. 15-16, 27-28. After the vehicle sped away, Appellant stopped responding to Izzy's text messages. *Id.* at pp. 27.

### F. December 14-15, 2022 – Appellant Seeks to Schedule a Third Meeting.

Detective Kolb received no further messages on December 14, 2022. On December 15, 2022, Detective Kolb texted Appellant as Izzy asking if he was okay.[5] The two then had the following exchange.

> APPELLANT: I'm ok. When I pulled on Grey's there was a cop sitting right there! I'm not sure what to think
>
> APPELLANT: At that moment I took it as a sign that we can't be. And tried to not text you anymore.. But I can't stop thinking about you
>
> IZZY: A cop?????
>
> IZZY: On my street?
>
> APPELLANT: Yes! Parked right in front of the house with the red car and motorcycle
>
> APPELLANT: He watched me pull in, I pretended to ignore him went around the back of Scottish and turned around and went back out like I was lost or something

---

[5] When asked why he reinitiated contact, Detective Kolb noted that although Appellant had vanished, he never formally repudiated his relationship with Izzy. N.T. 12/5/2023, p. 30. Accordingly, he reached out to investigate what happened to him. *Id.*

. . . .

> IZZY: I was lookin out my window but I didnt see ur car come down the steeet
>
> APPELLANT: Oh I did. I felt like I was on that show to catch a predator
>
> IZZY: Omgggg I heard about tht show lol but I never seen it
>
> APPELLANT: At that moment I seen that cop I texted you "almost there, I'm totally speeding ." I was making the loop through and speeding away. I felt like it was a set up, but now thinking it all through I know it wasn't
>
> APPELLANT: And like I said , I just can't stop thinking of you, it's making me nutzo
>
> APPELLANT: Can we try again
>
> APPELLANT: please
>
> IZZY: I mean I gess we can mayb try. I'm jus a little hurt still tht u didnt say nuthin
>
> APPELLANT: Well I blew that
>
> IZZY: It's ok I gess I understand tht u wer scared
>
> APPELLANT: Yup[…] of jail
>
> [*sic*]

C-2 at 12/15/2022, 2:06:50pm-6:17:37pm (emojis omitted). Appellant further noted

> APPELLANT: And I'm supposed to be like this adult that knows better and tells you "no" but I just can't seem to. Tell me why that is?
>
> APPELLANT: There's not one thing wrong with you! Who could not like you
>
> APPELLANT: You KNOW I like u
>
> [*sic*]

C-2 at 12/15/2022, 6:21:15pm-6:24:23pm.

Ultimately, it was decided that the two would meet the following day, December 16, 2022, at around 6:00pm. C-2 at 12/15/2022, 6:27:33pm-6:48:22pm; *id.* at 12/15/2022, 8:42:59pm-8:46:21pm. Appellant then sent Izzy several Google Street View photos of the homes near the Scottish Inn and again asked her to indicate which one was hers. N.T. 12/5/2023, pp. 36-37. Izzy once again rebuffed Appellant's inquiry. *Id.* Appellant closed the evening's communications by sending Izzy a message showing his live location near the Scottish Inn to which he attached the message "kissing you [good night]." *Id.* at pp. 38-39.

11

Prior to receiving this final message, Detective Kolb suspected that Appellant would stop by the Scottish Inn that night. *Id.* at p. 40. At approximately 10:15pm, the Detective arrived on-scene to conduct surveillance. *Id.* Shortly before Appellant shared his location with Izzy, the Detective observed a green Jeep Wrangler pull onto Gray Avenue before driving away out of sight. *Id.* at pp. 40-41. This vehicle matched the description of a vehicle Appellant had previously told Izzy he owned. *See, id.* at p. 40; C-2 at 12/15/2022, 8:37:38pm-8:43:14pm.

### G. December 16, 2022 – The Third Planned Meeting

On December 16, 2022, communication between Appellant and Izzy remained sparse. Appellant indicated that this was to keep a "low profile" before he made his "escape." C-2 at 12/16/2022, 4:42:43pm-4:45:55pm. At 5:36pm, Izzy informed Appellant that her mother had left, to which Appellant responded "[i]t's on." *Id.* at 5:36:48pm-5:44:45pm.

Detective Kolb arrived on-scene to begin surveillance at or around 5:30pm – a half-hour prior to the planned meeting. N.T. 12/5/2023, p. 54. By the time the Detective arrived, however, Appellant was already there sitting in his black Mercedez station wagon across the street from the Scottish Inn. *Id.* at pp. 55-57. Accompanying Detective Kolb was Detective Tom Jackson and patrol officer Francis McColgan. *Id.* at p. 55. As before, there was no supervisor on duty that evening, so Detective Kolb planned to have Officer McColgan make contact with Appellant to identify him via body camera. *Id.* Detective Kolb would maintain text communication with Appellant in the meantime and observe his movements. *Id.*

At approximately 6:30pm, Detective Kolb instructed Officer McColgan to approach Appellant's vehicle. *Id.* at pp. 69-70. As he drew near, Officer McColgan observed Appellant in the driver's seat. *Id.* at p. 72. However, because it was late in the day, it was too dark in the vehicle to see much else. *Id.* The Officer then asked to see Appellant's driving paperwork and inquired as

12

to what he was doing there. *Id.* Appellant complied, stating that he was there to pick up food from the nearby seafood restaurant, but that he had not yet ordered. *Id.* Obtaining Appellant's consent, Officer McColgan aimed his flashlight into the back of the vehicle and observed the seats to have been laid flat. *Id.* at pp. 72-73.

In the end, however, no meeting ever occurred. Rather, Izzy called off the meeting this time, claiming her aunt was coming over to watch her while her mother was away. *Id.* at p. 45. Thereafter, the two exchanged idle chatter via text message until communications terminated at 10:16pm. *See.* C-2 at 12/16/2022, 10:16:59pm.

*H. December 19, 2022 – Appellant Discovers the Truth.*

Appellant's messages to Izzy were less frequent over the next few days but retained their flirtatious character. *See, e.g., id.* at 12/17/2022, 11:12:59am ("[w]hen we finally get together it's going to be explosive"); *id.* at 12/18/2022, 5:59:24pm (referring to Izzy as "Habibi" – an Arabic term of endearment). In the early morning hours of December 19, 2022, however, Appellant's tone abruptly changed:

> APPELLANT: So I'm tired of playing with you, the moment you said your 13 I knew you were either a cop or some ahole trying to lure men out to rob them or worse. I made sure to message all those guys on Moco several weeks ago to not attempt to meet with you. Whoever you are you're sick.bye
>
> IZZY: Ummm lik wtf?
>
> IZZY: Las nite u call me habibi n now ur lik bein a huge dick if u dont wana hang out anymore it's fine lik I told u so many times. U dont need to b mean
>
> APPELLANT: Listen here Fella, buddy, Pal. Keep up the fakery. Next will be drone footage.
>
> . . .
>
> IZZY: Wat is tht wat r u talkin about???
>
> APPELLANT: These are obviously the kitchens at 1048 gray
>
> IZZY: I never told u my address once

APPELLANT: I think you're an old guy that walks a dog that canvases the neighborhood. Uses that area to lure people to the seedy motel. You stole the identity of a girl. Shameful to use

IZZY: How would someone steal my identity u dont make any sense

APPELLANT: It's very easy..... You're still saying you're actually a girl named Isabel

IZZY: My name is isabella not isabel ur lik a huge jerk idk y ur bein lik this

APPELLANT: Just a lot of pics, times, people doesn't match up with what I've seen, and it's know how so called concerned citizens of Bensalem make fake profiles trying to get Philly guys in trouble. It's well known

[Appellant sends several screen-shot photos of news stories reporting Bensalem child sex offender stings]

APPELLANT: If you are a real girl, you need to stop.

[*sic*]

C-2 at 12/16/2022, 2:26:07am-1:14:53pm. *See, also*, CRT-4, Slide 25-26.

Although it seemed unlikely Appellant would reengage after this conversation, Detective Kolb noted at trial that it is not uncommon for a suspect to reinitiate contact even after becoming suspicious. N.T. 12/5/2023, p. 84. Accordingly, he decided to give Appellant a week or two to see if he would do the same. *Id.* In the end, no contact came. On January 11, 2024, Detective Kolb secured a warrant, and Appellant was arrested the same day. *Id.* at p. 85.

### I. *Procedural History*

On January 11, 2023, the Commonwealth filed a Criminal Complaint charging Appellant with, *inter alia*, Attempted Indecent Deviate Sexual Intercourse,[6] Attempted Statutory Sexual Assault,[7] Attempted Sexual Abuse of Children,[8] and Unlawful Contact with a Minor.[9] Discovery was exchanged, and Appellant proceeded to jury trial before this Court on December 4-5, 2023.

---

[6] 18 Pa.C.S. §901(a) (Criminal Attempt) and 18 Pa.C.S. §3123(a)(7) (Involuntary Deviate Sexual Intercourse).
[7] 18 Pa.C.S. §901(a) (Criminal Attempt) and 18 Pa.C.S. §3122.1(b) (Statutory Sexual Assault).
[8] 18 Pa.C.S. §901(a) (Criminal Attempt) and 18 Pa.C.S. §6312(b) (Sexual Abuse of Children).
[9] 18 Pa.C.S. §6318(a)(1).

14

On December 6, 2023, Appellant was convicted of each of the offenses mentioned above. Sentence was deferred.

On January 24, 2024, Appellant was sentenced on the Unlawful Contact charge to a period of not les than six (6) years' to no more than twelve (12) years' incarceration at a state correctional institution. No further penalty was assessed on the remaining counts. On February 2, 2024, Appellant filed a Motion for Reconsideration of Sentence, which this Court denied on March 25, 2024. On February 26, 2024, Appellant was determined not to meet the criteria to be designated a sexually violent predator. On April 24, 2024, Appellant filed a Notice of Appeal to the Superior Court. Finally, on April 25, 2024, this Court issued an Order directing Appellant to file a Concise Statement of Errors Complained of on Appeal.

## II.   CONCISE STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

On May 16, 2024, in accordance with Pennsylvania Rule of Appellate Procedure 1925(b), Appellant filed his Concise Statement of Errors Complained of on Appeal, set forth *verbatim* herein:

1.     The verdict of guilty of Unlawful Contact With a Minor - Involuntary Deviant Sexual Intercourse was not supported by sufficient evidence because the Commonwealth failed to establish beyond a reasonable doubt that Appellant had contact with the detective for the purpose of engaging in involuntary deviant sexual intercourse.

2.     The verdict of guilty of Unlawful Contact With a Minor- Statutory Sexual Assault was not supported by sufficient evidence because the Commonwealth failed to establish beyond a reasonable doubt that Appellant had contact with the detective for the purpose of engaging in statutory sexual assault.

3.     The verdict of guilty of Criminal Attempt — Statutory Sexual Assault was not supported by sufficient evidence because the Commonwealth failed to establish beyond a reasonable doubt that Appellant had the intent to commit the crime of statutory sexual assault.

4.     The verdict of guilty of Criminal Attempt — Statutory Sexual Assault was not supported by sufficient evidence because the Commonwealth failed to establish beyond a reasonable doubt that Appellant took a substantial step towards the commission of the crime of statutory sexual assault.

15

5. The verdict of guilty of Criminal Attempt — Involuntary Deviant Sexual Intercourse was not supported by sufficient evidence because the Commonwealth failed to establish beyond a reasonable doubt that Appellant had the intent to commit the crime of involuntary deviant sexual intercourse.

6. The verdict of guilty of Criminal Attempt — Involuntary Deviant Sexual Intercourse was not supported by sufficient evidence because the Commonwealth failed to establish beyond a reasonable doubt that Appellant took a substantial step towards the commission of the crime of involuntary deviant sexual intercourse.

7. The verdict of guilty of Attempting to Secure Pornographic Photographs from a Minor was not supported by sufficient evidence because the Commonwealth failed to establish beyond a reasonable doubt that Appellant took a substantial step towards the commission of the crime of securing a pornographic photograph from a minor.

8. The verdict of guilty of Attempting to Secure Pornographic Photographs from a Minor was against the weight of the evidence because the greater weight of the evidence established that Appellant did not attempt to cause a child under the age of 18 to produce or send a pornographic photograph.

9. The verdict of guilty of Unlawful Contact With a Minor- Involuntary Deviant Sexual Intercourse was against the weight of the evidence because the greater weight of the evidence established that Appellant did not have contact with the detective for the purpose of engaging in involuntary deviant sexual intercourse.

10. The verdict of guilty of Unlawful Contact With a Minor — Statutory Sexual Assault was against the weight of the evidence because the greater weight of the evidence established that Appellant did not have contact with the detective for the purpose of engaging in statutory sexual assault.

11. The verdict of guilty of Criminal Attempt — Involuntary Deviant Sexual Intercourse was against the weight of the evidence because the greater weight of the evidence established that Appellant did not have the intent to commit the crime of involuntary deviant sexual assault.

12. The verdict of guilty of Criminal Attempt — Involuntary Deviant Sexual Intercourse was against the weight of the evidence because the greater weight of the evidence established that Appellant did not take a substantial step towards the commission of the crime of Involuntary Deviant Sexual Intercourse.

13. The verdict of guilty of Criminal Attempt — Statutory Sexual Assault was against the weight of evidence because the greater weight of the evidence established that Appellant did not take a substantial step towards the commission of the crime of Statutory Sexual Assault.

14. The verdict of guilty of Criminal Attempt - Statutory Sexual Intercourse was against the weight of the evidence because the greater weight of the evidence established that Appellant did not have the intent to commit the crime of statutory sexual assault.

## III. DISCUSSION

### A. Standard of Review

In essence, Appellant's sole challenge is to the sufficiency and weight of the evidence supporting each of his five convictions. "A claim challenging the sufficiency of the evidence is a question of law," which is reviewed *de novo. Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). In reviewing such claims, the Supreme Court has established this standard of review:

> [The reviewing court] examine[s] whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, support the jury's finding of all elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence.

*Commonwealth v. Doughty*, 126 A.3d 951, 958 (Pa. 2015).

As to weight of the evidence claims, a motion for new trial based on weight of the evidence "is addressed to the discretion of the trial court." *Commonwealth v. Cousar*, 928 A.2d 1025, 1035-36 (Pa. 2007). As such, an appellate court reviews only the exercise of the trial court's discretion, not the underlying weight of the evidence itself. *Id.* at 1036. A trial court's judgment will be reversed only when "the facts and inferences of record disclose a palpable abuse of discretion," rendering the denial of a weight of the evidence challenge "the least assailable of [a trial court's] rulings." *Id.* Determinations as to the credibility of witness testimony and other evidence are left to the sole discretion of the factfinder. *Id.*

### B. Each of Appellant's Convictions Were Supported by Sufficient Evidence and Not Contrary to the Weight of the Evidence.

Appellant's sole issue on appeal attacks the sufficiency and weight of the evidence claim as to each of his five convictions. As noted above, the relevant question regarding sufficiency claims is "whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, support the jury's

17

finding of all elements of the offense beyond a reasonable doubt." *Doughty*, 126 A.3d at 958. Importantly, "[t]he Commonwealth may sustain its burden by means of wholly circumstantial evidence." *Id.*

As to the weight of the evidence, "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013). Instead, a new trial is warranted only if "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.* (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000)) (internal quotations omitted). Alternatively stated, a weight of the evidence claim is properly granted "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Cousar*, 928 A.2d at 1036.

"The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Salinas*, 307 A.3d 790, 795 (Pa. Super. 2023) (quoting *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015)). Conflicts in testimony and the credibility of witnesses are for the finder of fact to resolve. *Id.*

Turning to the substantive charges, Criminal Attempt is defined by the Crimes Code as follows:

> (a) **Definition of attempt.**--A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime.

18 Pa.C.S. §901(a). As distilled by the Superior Court,

> [t]he elements of criminal attempt are: (1) an intent to commit a specific crime; and (2) any act constituting a substantial step toward the commission of that crime. *Commonwealth v. Pasley*, 743 A.2d 521, 523 (Pa.Super.1999). "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done

18

before the actual commission of the crime." *Commonwealth v. Gilliam*, 273 Pa.Super. 586, 417 A.2d 1203, 1205 (1980). The defendant need not actually be in the process of the crime when arrested in order to be guilty of criminal attempt. *Id.*

*Commonwealth v. Zingarelli*, 839 A.2d 1064, 1069 (Pa. Super. 2003).

Here, Appellant was charged with Attempted Involuntary Deviate Sexual Intercourse ("IDSI"), Attempted Statutory Sexual Assault, and Attempted Sexual Abuse of Children. Accordingly, it was the Commonwealth's burden to prove that Appellant had the intent to commit these crimes and committed an act constituting a substantial step toward their commission. Appellant was also charged with Unlawful Contact with a Minor. Accordingly, it was also the Commonwealth's burden to show that Appellant intentionally contacted a minor – or a police officer posing as a minor – for the purpose of engaging in a sexual offense. *See*, 18 Pa.C.S. §6318(a)(1).

For the following reasons, this Court finds that the evidence adduced at trial was sufficient to carry the Commonwealth's burden, and that Appellant's ultimate convictions were not against the weight of the evidence.

      i. *The Commonwealth Proved Each Element of Attempted Involuntary Deviate Sexual Intercourse and Attempted Statutory Sexual Assault Beyond a Reasonable Doubt.*

The crime of IDSI is defined by the Crimes Code, in relevant part, as follows:

**(a) Offense defined.**—A person commits a felony of the first degree when he or she engaged in deviate sexual intercourse with a complainant:

. . .

(7) who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other.

18 Pa.C.S. §3123(a)(7). "Deviate sexual intercourse" constitutes, *inter alia*, "[s]exual intercourse per os or per anus between human beings." 18 Pa.C.S. §3101.

Statutory Sexual Assault, on the other hand, is defined, as follows:

19

**(a) Felony of the second degree.**--Except as provided in section 3121 (relating to rape), a person commits a felony of the second degree when that person engages in sexual intercourse with a complainant to whom the person is not married who is under the age of 16 years and that person is either:

> (1) four years older but less than eight years older than the complainant; or

> (2) eight years older but less than 11 years older than the complainant.

**(b) Felony of the first degree.**--A person commits a felony of the first degree when that person engages in sexual intercourse with a complainant under the age of 16 years and that person is 11 or more years older than the complainant and the complainant and the person are not married to each other.

18 Pa.C.S. §3122.1. In addition to its ordinary meaning, "sexual intercourse" encompasses "intercourse per os or per anus, with some penetration however slight." 18 Pa.C.S. §3101.

Read together, therefore, to be guilty of both Attempted IDSI and Attempted Statutory Sexual Assault, the Commonwealth must have shown that Appellant (1) intended to engage in ordinary and/or deviate sexual acts with a person under the age of sixteen; (2) was at least four years older than the minor; (3) was not married to the minor; and (4) made a substantial step toward completing said acts.

Here, there is no dispute that the Izzy character was thirteen years old,[10] that Appellant was not married to Izzy, or that Appellant was fifty-two years old at the time he was messaging Izzy.[11] Accordingly, the only meaningful areas of dispute relate to Appellant's intent and whether he made a substantial step toward committing these offenses. This Court concludes that the evidence adduced before this Court – the vast bulk of which being Appellant's own words – supported both points beyond a reasonable doubt.

First, Appellant's messages to Izzy were clear that he had every intention of meeting with Izzy near the Scottish Inn. For example, on December 4, 2022, Appellant made several inquiries

---

[10] *See*, N.T. 12/4/2023, p. 29.
[11] *See*, N.T. 12/4/2023, pp. 91.

to Izzy regarding to her mother's work schedule for the week of December 13. *See*, N.T. 12/4/2023, pp. 57-58. Appellant continued these inquiries over the next several days. *See*, C-2 at 12/6/2022, 4:25:32pm ("[h]ow late next week does Mom work[?]"); *id.* at 12/8/2022, 5:50:32pm ("[n]ext week is all I think about, did you find out the work schedule[?]").

Appellant also made several attempts to persuade Izzy to disclose her specific address. Appellant began this line of questioning on December 2, 2022 when he asked Izzy via Moco "[w]here in Bensalem do you live?" *See*, N.T. 12/4/2023, pp. 42-43. Then, just two days later, he asked Izzy whether her house was "next to the body shop [on Gray Avenue] or the house with the motorcycle." *Id.* at p. 55. Appellant temporarily relented when Izzy declined to say but renewed his efforts on December 15, 2022. Specifically, a little after 10:00am, Appellant sent Izzy several photos of a multi-unit apartment structure on Gray Avenue, apparently taken from Google Street View. *See*, CRT-6, Slide 18. Appellant circled three doors in the complex – one in yellow, and two in red. N.T. 12/5/2023, p. 36. After sending the images, Appellant asked Izzy whether hers was the door circled in yellow. *See, id.* at pp. 37. Izzy responded vaguely that she lived in that complex but refused to answer with any more specificity. *Id.* This was the last such request Appellant made.

More importantly, however, Appellant himself *explicitly articulated* his intent to meet on numerous occasions both before and after the December 13 meeting fell through. For example, on December 12, 2022, Appellant texted Izzy that they would no longer be renting a room at the Scottish Inn, but that they would "make [it] work" using his car instead. C-2 at 12/12/2022, 8:30:44pm. He then assured her that he was "not backing out this time" as they had "a mission to complete." *Id.* at 12/12/2022. 8:45:04pm-8:47:15pm.

Next, on the day of the December 13 meeting – indeed, fifteen minutes prior – Appellant again assured Izzy of his intention to follow through in response to her statement that they did not

21

have to meet if Appellant did not want to. *See, id.* at 12/13/2022, 10:46:07-10:46:51. In other words, *despite being given an opportunity to cancel the meeting*, Appellant doubled-down on his desire to meet with Izzy as they originally planned.

Appellant maintained this attitude in the days following his abandonment of the December 13 meeting. Specifically, on December 15, 2022, Appellant insisted the only reason he ran was because he believed to have seen a police officer parked on Gray Avenue. *See, id.* at 12/15/2022, 2:06:50pm-5:47:39pm. He essentially begged Izzy to give him another chance, promising that he would not "bail" next time. *See, id.* at 12/15/2022, 6:07:07pm-6:36:18pm. *See, also, id.* at 12/15/2022, 10:01:20pm ("I'm not standing you up again"). Appellant again reiterated this point on the day of their rescheduled December 16 meeting. *See,* C-2 at 12/16/2022, 4:20:36pm.

Finally, and most conclusively, Appellant *physically traveled* to the pre-arranged meeting location on two separate occasions. The testimony of Detective Brian Oliverio, for example, established credibly that on December 13, 2022, a dark-colored Mercedes-Benz station wagon, bearing New Jersey plates, pulled into and sped away from the Gray Avenue meeting location at the pre-arranged time. *See,* N.T. 12/5/2023, pp. 12-14. Detective Oliverio later identified this vehicle as Appellant's own black Mercedes-Benz station wagon using an image captured by a Bensalem tag-reader on January 3, 2023. *See, id.* at pp. 15-16. *See, also,* Commonwealth's Exhibit C-11 (the tag-reader photograph). Appellant's presence at the December 13 meet-up was corroborated by his ensuing communications with Izzy explaining his decision to run away. *See, e.g.,* C-2 at 12/15/2022, 2:06:50pm-5:43:34pm (explaining that a "cop" watched Appellant pull onto Gray Avenue, and that Appellant "pretended to ignore him" and went around the Scottish Inn to "back out like [he] was lost or something").

Then, on December 16, 2022, Appellant was directly observed by Detective Kolb parked across the street from the Scottish Inn approximately thirty minutes prior to the rescheduled meeting. *See*, N.T. 12/5/2023, pp. 54-57. Appellant again used his black Mercedes-Benz station wagon. *Id.* Detective Kolb's testimony on this matter was corroborated by Officer Francis McColgan, who directly interacted with Appellant as he was waiting for Izzy to appear. *See, id.* at pp. 69-73. Indeed, so overwhelming was the evidence on this score that Appellant himself admitted to attending both meetings. *See*, N.T. 12/5/2023, pp. 127, 132.

In sum, the evidence established credibly that Appellant made substantial efforts to secure the details of Izzy's mother's work schedule and Izzy's precise location. The evidence also established numerous instances of Appellant himself affirming and reaffirming his intent to follow through on his meet-up plans with Izzy. Finally, the evidence was clear that not only did Appellant agree to these plans, he also pursued two of them to near-completion. With these facts in mind, the evidence of Appellant's intent to meet up with Izzy is overwhelming.

Second, the evidence was also conclusive that Appellant's purpose in these meetings was to engage in sexual activity. For example, throughout their communications, Appellant expressed his desire to perform oral sex on Izzy on no less than four separate occasions. The first was on December 2, 2022, when Appellant offered via Moco to give Izzy "head" in his car at their first meeting. *See*, N.T. 12/4/2022, p. 41. As established by Detective Kolb, "head" in this context is a common euphemism for oral sex. *See, id.*

The second such reference occurred on December 6, 2022, when Appellant described his lips as being "[s]oft, full, and *always needing a bedtime snack*." C-2 at 12/6/2022, 9:46:49pm (emphasis added). While less direct than the December 2 Moco message, Appellant made this statement in conjunction with other sexually suggestive messages. *See, e.g., id.* at 12/6/2022,

23

9:36:12pm (saying he would "have to watch [Izzy's] hands" while snuggling); *id.* at 12/6/2022, 9:38:53 (saying he would give Izzy foot rubs). Read together, therefore, one may reasonably interpret this message as suggesting Izzy would be Appellant's "bedtime snack."

Appellant's third reference occurred on December 11, 2022. After wishing that Izzy was in bed with him, Appellant told her he would, *inter alia*, put her onto his chest and interlock fingers with her. *Id.* at 12/11/2022, 11:06:56am. Continuing his use of eating-related euphemisms, Appellant fantasized that Izzy would "push [herself] into [his] face and grind *as [she] yell[ed] at [him] to eat it.*" *Id.* at 12/11/2022, 11:06:56am (emphasis added).

Finally, on December 12, 2022, Appellant texted Izzy an illustration of several Kama Sutra-styled sex positions. *See,* CRT-6 at Slide 10. Appellant made several red check marks next to those positions he believed they could accomplish in his car. *See,* N.T. 12/4/2023, p. 80. One of these positions depicts a male stick figure performing oral sex on a female stick figure. *See,* CRT-6 at Slide 10.

In addition to these explicit references to oral sex, Appellant's texts also referenced a range of other sex or sex-adjacent acts he intended to perform on Izzy. For example, on December 11, 2022, Appellant and Izzy had the following exchange:

> IZZY: Was else u wana do w me
> APPELLANT: Caress you, nibble on your ear, suck your neck and bite your lips
> APPELLANT: As you get moist you put your hand down inside your panties and then bring your hand up for us to lick your fingers.
> [*sic*]

C-2 at 12/11/2022, 9:24:44am-10:34:31am (emojis omitted and lack of punctuation in original).

Further, *mere hours* before their second attempted meeting on December 13, 2022, Appellant asked Izzy whether she was "into licking and sucking" like he was. *Id.* at 12/13/2022, 7:06:36pm. Clearly, Appellant was gauging whether Izzy would perform oral sex on him. Finally,

24

another of the positions depicted in the Kama Sutra image portrays vaginal intercourse between the male and female stick figures. *See*, CRT-6 at Slide 10. At bottom, then, Appellant's own messages indicate beyond a reasonable doubt that he intended to engage in a variety of sexual acts with Izzy, including mutual masturbation, oral sex, and vaginal intercourse.

Third, the trial evidence was unambiguous that Appellant took not one, but several substantial steps toward the completion of these acts. Primarily, as discussed above, the uncontroverted evidence showed not only that Appellant made several arrangements to meet with Izzy, but he also traveled to their rendezvous point on December 13 and 16, 2022. *See*, N.T. 12/5/2023, pp. 12-16, 54-57, 69-73. What the evidence also showed, however, was that Appellant visited the area near Izzy's supposed home two other times independent of their December 13 and 16 meetings.

On December 4, 2022, Appellant sent Izzy a photo of the Scottish Inn's road-fronting sign, saying he could not get her out of his head. *See*, N.T.12/4/2023, p. 54. Clearly, Appellant must have visited the area to get that picture. Further, on December 15, 2022, Appellant sent Izzy a live location marker displaying his presence across the street from the Scottish Inn. *See*, N.T. 12/5/2023, pp. 38-39. His on-scene presence was confirmed by Detective Kolb, who observed a green Jeep Wrangler in the area at around the same time. *Id.* at pp. 40-41. This vehicle matched the description of a vehicle Appellant had previously told Izzy he owned. *See*, C-2 at 12/15/2022, 8:37:48pm-8:43:14pm (describing his Jeep as "army green"). In other words, not only did Appellant show up at two meetings, but he also performed additional reconnaissance on Izzy's home both before and after those meetings.

In sum, then, the evidence adduced before this Court at trial proved beyond a reasonable doubt that Appellant (1) intended to meet up with Izzy; (2) intended to engage in prohibited sexual

25

conduct with her; (3) was not married to Izzy; (4) was more than four years older than Izzy; and (5) made several substantial steps toward accomplishing his criminal designs. Accordingly, Appellant's convictions for Attempted IDSI and Attempted Statutory Sexual Assault were supported by sufficient evidence, and not contrary to the weight thereof.

> ii. *The Commonwealth Proved Each Element of the Attempted Sexual Abuse of Children Beyond a Reasonable Doubt.*

As to the crime of Sexual Abuse of Children, the Crimes Code provides as follows:

**(b) Photographing, videotaping, depicting on computer or filming sexual acts.-**

(1) Any person who causes or knowingly permits a child under the age of 18 years to engage in a prohibited sexual act or in the simulation of such act commits an offense if such person knows, has reason to know or intends that such act may be photographed, videotaped, depicted on computer or filmed.

18 Pa.C.S. §6312(b)(1). In other words, §6312 prohibits, *inter alia*, the knowing possession of photographs or computer depictions of children engaged in prohibited sexual acts. As further defined by the statute, these acts include, *inter alia*, "lewd exhibition of the genitals or nudity . . . depicted for the purpose of sexual stimulation or gratification of [the viewer]." 18 Pa.C.S. §6312(g).

In sum, then, to be guilty of Attempted Sexual Abuse of Children, the Commonwealth must have shown that Appellant (1) intended to possess photographs or computer depictions of a child engaged in one or more prohibited sexual act; and (2) took a substantial step toward obtaining such a depiction. *See, e.g., Commonwealth v. Koehler*, 914 A.2d 427, 436 (Pa. Super. 2006) (emphasis omitted) (articulating the Commonwealth's required showing to prove a violation of §6312).

As above, the evidence adduced before this Court proved Appellant's guilt beyond a reasonable doubt. Specifically, it proved that Appellant requested Izzy send him a photograph of her vagina. On December 2, 2022, Appellant asked Izzy "[c]an I get a peek at what I'll be

26

eating[?]" N.T. 12/4/2023, p. 47. This request followed shortly after Appellant's offer on Moco to give Izzy oral sex. *See*, N.T. 12/4/2022, p. 41. In this context, therefore, his message was clearly intended to request a photograph of Izzy's vagina.

This interpretation is corroborated by Appellant's own testimony. Specifically, Appellant acknowledges that even under his own defense theory – discussed in greater detail under Part III(B)(iv), *infra* – he did not know *for certain* that Izzy was not a thirteen-year-old girl. On cross examination, he had the following exchange with counsel for the Commonwealth:

> Q: So you had a gut feeling and intuition that you were talking to a fake profile?
> A: Correct.
>
> Q: A 40-year- old or something adult male?
>
> A: Could be male, could be another-female, different age. Definitely not the person they were portraying to be.
>
> Q: But there was still a chance it could be because you weren't positive?
>
> A: Correct.
>
> Q: Okay. So there was a chance then when you asked for that photograph of what you'd be eating that you could have actually gotten an image of a child's vagina?
>
> A: Was not expecting it. If you're savvy on the internet, you know the rules of the internet. You do not send explicit pics.
>
> Q: And you're savvy on the internet?
>
> A: Somewhat.

N.T. 12/5/2023, pp. 156-57. In other words, Appellant both conceded that the message was properly understood to request an explicit photo and acknowledged that he could have been texting a thirteen-year-old girl. These concessions, in addition to the message's plain meaning, amply support a jury's finding that Appellant intended to obtain child pornography and sent this message as a substantial step in furtherance of that intent.

### iii. *The Commonwealth Proved Each Element of Unlawful Contact with a Minor Beyond a Reasonable Doubt.*

Finally, Unlawful Contact with a Minor is defined, in relevant part, as follows:

(a) **Offense defined.**--A person commits an offense if the person is intentionally in contact with a minor, or a law enforcement officer acting in the performance of duties who has assumed the identity of a minor or of another individual having direct contact with children, as defined under 23 Pa.C.S. § 6303(a) (relating to definitions), for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth:

(1) Any of the offenses enumerated in Chapter 31 ([sexual offenses]).

18 Pa.C.S. §6318(a)(1).

In other words, to be guilty of Unlawful Contact with a Minor, the Commonwealth must have proven that Appellant (1) intentionally, either directly or indirectly, contacted or communicated with a minor, or police officer portraying a minor, (2) for the purpose of engaging in a crime under Chapter 31, such as Indecent Assault or Statutory Sexual Assault. *See*, *Commonwealth v. Evans*, 901 A.2d 528, 537 (Pa. Super. 2006).

Here, the evidence adduced by the Commonwealth on this issue carried its burden in spades. First, there is no dispute that Appellant was in direct contact with Detective Kolb – a police officer portraying a minor online – throughout the term of Detective Kolb's investigation. Detective Kolb testified, for example, that he was the officer that created Izzy's profile, and that he was the one in exclusive control of the messages sent from the account. *See*, N.T. 12/4/2023, pp. 29-31. Further, at the time Izzy's profile was contacted by the user named "OnThaHunt," the account featured a profile picture depicting Appellant standing in front of a horse. *See*, C-1. Finally, Detective Kolb established that when his communications with the suspect moved to text message, the phone number that initiated contact with Izzy was registered to Appellant. N.T. 12/4/2023, p. 48.

Second, as discussed under Part III(B)(i), *supra*, the messages and testimony presented by the Commonwealth proved beyond a reasonable doubt that Appellant intended to meet up with Izzy and engage in both deviate and ordinary sexual activity with her. These acts are prohibited by

28

Chapter 31 of the Crimes Code as IDSI and Statutory Sexual Assault. *See*, 18 Pa.C.S. §3123(a)(7) and 18 Pa.C.S. §3122.1(b).

Accordingly, Appellant's conviction for Unlawful Contact with a Minor is supported by sufficient evidence and is not against the weight of the evidence.

iv. *A Jury Could Reasonably Have Found Appellant's "Scamming the Scammer" Defense Unpersuasive.*

At trial, Appellant did not meaningfully dispute the essential facts of what transpired between December 1 and December 19, 2022, and neither could he. The evidence was overwhelming that almost immediately after he discovered the Izzy account, Appellant became mired in an extensive investigation into its veracity. Indeed, by the time of his arrest, Appellant had made eighty-two independent web searches relating to Snyder Middle School – the school featured on some of Izzy's clothing – and forty-four searches relating to 1048 Gray Avenue – the address at which Appellant believed Izzy lived. *See*, N.T. 12/5/2023, pp. 87-89. These Gray Avenue searches included digital image queries and property record searches through the website Spokeo.com. *Id.* at pp. 89-90.

Rather, Appellant's defense focused entirely on the intentions underlying his investigation. Specifically, Appellant argued that from the very beginning, his investigation was intended not to prove that Izzy *was* a real thirteen-year-old, but to prove that she was *not*. Indeed, just as Detective Kolb adopted the persona of Izzy to root out predators, Appellant likewise insisted that the version of him depicted in his messages to Izzy was itself a persona designed to outwit internet fraudsters. In short, Appellant never dreamed of meeting up with a child; he was simply trying to scam a scammer.

According to Appellant, his obsession with online scam accounts began when his son became a victim of cyberbullying at the age of twelve. *See*, N.T. 12/5/2023, p. 111. This experience

29

prompted Appellant to "[take] on a personality to counteract the people that were bullying him," spawning a fixation with rooting out fake "catfish" accounts on the internet. *Id.*

Appellant supported his novel theory by reference to several minor inconsistencies that raised his suspicions about the account's legitimacy. For one, he opined that the account was insufficiently personalized and featured a "photo shopped" profile picture – telltale signs, in his experience, of a fake account. *Id.* at p. 112. Appellant also noted that the account's comment page had been left open, permitting users from the Moco community to leave messages. *Id.* at p.114. This deepened Appellant's concerns, he argued, because most real users tend to limit or close that functionality. *Id.*

Moreover, Appellant urged that throughout his interactions with the Izzy account, several of the verification photos Izzy sent seemed staged, "photo shopped," or otherwise not in line with the broader context of their conversation. *See, id.* at pp. 120-21, 134. These deceptive photos, Appellant insisted, made him suspicious that Izzy was trying to hide something. *See, id.* Appellant further noted that Izzy never gave up her specific address. *Id.* at p. 124. This struck him as odd as "[i]f they're so willing to be down for whatever and want to meet, they would . . . give up their address." *Id.* All told, Appellant urged the jury that as strange as he admits his behavior was in this case, he is simply a man with a peculiar hobby – not a predator. *See, id.* at pp. 111, 118, 138.

It appears, then, that the whole of Appellant's weight of the evidence argument hinges entirely on this evidence. As an initial matter, however, this Court must reiterate that the weight given by the jury to certain evidence, including the credibility of witnesses, is a matter solely within its competence as factfinder. *Commonwealth v. Salinas*, 307 A.3d 790, 795 (Pa. Super. 2023). It would be inappropriate, therefore, for this Court to override its findings by reweighing

30

the evidence itself. *See, id.* Accordingly, the jury's decision to disregard Appellant's defense as incredible lies beyond this Court's reach.

Even if this Court were to revisit that finding, however, no relief would be warranted, as the non-credibility of Appellant's theory of the case is well supported by the evidence. Specifically, when the relevant facts at issue here are consulted, Appellant's theory simply does not explain his conduct in this case.

First, Appellant's theory does not explain his initial interactions with the Izzy account. The evidence adduced below showed that Appellant initially cut contact with Izzy after he was informed of her age. *See*, N.T. 12/4/2023, p. 40. However, he then resumed contact two hours later via Moco asking what they could do if he agreed to continue. *See*, C-1. Appellant then texted Izzy until December 3, 2022 – their first arranged meeting – when he again repudiated their communication via Moco message. *See*, C-1. Like before, however, Appellant once again initiated contact on December 4, 2022 by messaging Izzy that he could not get her out of his head. *See*, N.T. 12/4/2023, p. 54. Appellant remained in constant communication with Izzy thereafter.

In totality, this episode demonstrates that Appellant clearly agonized over whether to continue his communication with the Izzy account. After he was informed of her age, he was initially scared away, but later returned to investigate whether she was worth the risk. Indeed, Appellant himself expressed a judgment in the affirmative in a text to Izzy on December 13, 2022. *See*, C-2 at 12/13/2022, 7:25:14pm-7:27:40pm (expressing to Izzy that she was worth the risk).

Appellant attempted at trial to explain this behavior as creating a series of "highs and lows" – a practice designed to build up an adversary's expectations before ripping them away. *See*, N.T. 12/5/2023, pp. 119, 126, 193. Indeed, this was Appellant's explanation for most of his conduct, including his statements about renting a Scottish Inn suite and his sexual text messages to Izzy.

31

*See, id.* at pp. 160-63, 182. Appellant's explanation is, however, but one of several possible interpretations. This Court cannot say, therefore, that a jury finding his explanation incompatible with his proven conduct shocks the conscience.

Second, Appellant's alleged suspicion of Izzy's veracity directly conflicts with his own text messages. For example, on December 2, 2022, Appellant texted Izzy:

> APPELLANT: I'm just happy you're you, it be so much frauding especially on Moco
>
> IZZY: Ya it seems lik a lotta the guys on there r creeps lol
>
> APPELLANT: Yes a lot on there and they pretend to be girls
>
> IZZY: Wats the point of tht lol
>
> APPELLANT: Man I don't know it's kind of weird
>
> APPELLANT: That's why I was asking that pic about touching nose cuz they be trying to lead you on and then they can't do that. Probably to get you to come out and meet them and then try and Rob you or something
>
> [*sic*]

C-2 at 12/2/2022, 7:56:54pm-8:06:47pm. This message Appellant clearly implies that Izzy's verification photo of her touching her nose assuaged his fears.

Appellant continued this theme on December 6, 2022, when he texted Izzy that their proximity had him "*initially* like this got to be some type of setup because it's too good to be true." *Id.* at 12/6/2022, 4:01:54 (emphasis added). The natural import of both messages, taken together, is that contrary to his trial testimony, Appellant had long satisfied himself of Izzy's authenticity and continued to message her under that belief.

Third, Appellant's alleged reasons for opening his "investigation" are incongruous with his subsequent behavior. At trial, Appellant testified that shortly after he discovered the Izzy account, he became concerned for the safety of the other MocoSpace users interacting with her. N.T. 12/5/2023, p. 117. He expressed concern that the Izzy fraud was either attempting to lure people out to be robbed, or a vigilante assuming law enforcement's responsibilities in capturing child

32

predators. *Id.* at pp. 173-75, 180. Accordingly, Appellant urged that his primary motivations in exploring the Izzy account were (1) to prove to other Moco users that Izzy was a fake; and (2) to report the scammer/vigilante to police. *See, id.*

Despite this intent, however, Appellant never shared his findings with police even after he gathered enough evidence to prove Izzy was fake. *See, id.* at p. 184. Moreover, despite his alleged concern about other Moco users, Appellant abandoned Moco after December 6, 2022, opting instead to communicate with Izzy exclusively through text. *See, id.* at p. 151. Appellant alleged to have maintained a separate Moco account during this time, but no other evidence of its existence, or Appellant's activities thereunder, was introduced.

More importantly, these intentions directly conflict with Appellant's conduct after the failed December 13 meeting. On cross-examination, Appellant admitted that he saw "what [he] believed to be [an] undercover cop" parked on Gray Avenue. *Id.* at p. 170. If Appellant truly was simply investigating the identity of the Izzy account holder, this observation would presumably have closed the case. If the man in question was a police officer, as Appellant believed, his concerns about vigilantism should have been assuaged. He would have been free, therefore, to terminate his investigation and suspend contact with law enforcement.

But even if the man was not a police officer, this too should have resolved Appellant's investigation. If the man was not law enforcement, his suspicions of a scam or vigilante activity would have been confirmed. Appellant could then have spread the word on Moco and to law enforcement. In fact, he had this precise opportunity on December 16, 2022, when he was approached by Officer McColgan at the meeting location. *See,* N.T. 12/4/2023, pp. 69-73. Instead, Appellant continued his affair with Izzy, presumably on the off chance she was who she claimed.

33

Finally, not only is Appellant's theory incompatible with his pre- and mid-investigation conduct, it also conflicts with his post-investigation behavior. For example, despite allegedly being suspicious the entire time, Appellant's tone with Izzy radically changed on December 19, 2022. Specifically, Appellant abruptly becomes irate with Izzy, accusing her of being "a cop or some ahole [*sic*] trying to lure men out to rob them." C-2 at 12/19/2022, 2:26:07am. When pressed about this sudden tonal shift, Appellant offered no explanation beyond having gathered enough information and not really "want[ing] to be bothered anymore." N.T. 12/5/2023, pp. 185-86.

Further, as established by Detective Kolb's testimony, a data pull of Appellant's cell phone revealed that immediately after he cut off communication with Izzy on December 19, he began frantically searching the internet for news stories related to Bensalem Police child sex stings. *See*, *id.* at p. 90-91. These searches continued well into January 2023. *Id.* at p. 91.

At bottom, Appellant's defense theory is a demanding proposal. To credit Appellant's tale, one must either be capable of explaining each of the above contradictions, or willing to set them aside. One must also believe that despite Appellant's extensive investigation, he was never certain, until the last possible moment, that Izzy was not a thirteen-year-old girl. *See*, N.T. 12/5/2023, pp. 150, 155-57, 169, 177 (asserting variously that he could not be certain Izzy was a fake). One must believe that Appellant would have risked sending pages upon pages of sexual texts to a child, including a request for a photo of her vagina. Finally, to accept Appellant's account, one must believe that despite repeatedly arranging to meet with Izzy, and following through on those plans twice, Appellant never actually intended to do so. All things considered, this Court cannot say that the jury exceeded its reason in disbelieving such an outlandish proposition.

## IV.  CONCLUSION

For the aforementioned reasons, this Court believes that the issues which Appellant has complained of in his Concise Statement are without merit. Accordingly, this Court respectfully submits that Appellant's December 6, 2023 convictions should be affirmed and Appellant's Appeal be denied.

BY THE COURT:

_____

**JEFFREY L. FINLEY, J.**

DATE: July 10, 2024